W. D. SUMMERS v. ELIZA MOORE et al.

*Resulting Trust—Parol Evidence—Fraudulent Conveyance.*

1. Where, upon a purchase of property, the conveyance of the legal title is taken in the name of one person, while the consideration is given or paid by another at the same time or previously, and as part of the same transaction, the parties being strangers to each other, the presumption, in the absence of rebutting circumstances, is that he who supplies the money intends the purchase for his own benefit, and not for another, and that the conveyance in the name of the other is a matter of convenience and arrangement for collateral purposes, and a resulting trust immediately arises from the transaction, and the person named in the conveyance will be a trustee for the party from whom the consideration proceeds.

2. In such case the burden is upon him who claims the resulting trust, and as the law gives a peculiar force and solemnity to deeds, it will not allow them to be overthrown by mere words, but only by facts strong, clear and unequivocal.

3. Parol evidence is admissible to rebut a resulting trust, but the burden is upon the nominal purchaser, who must establish by sufficient testimony that it was intended that he should take a beneficial interest.

4. Although one who supplies the purchase-money and procures the conveyance to be made to another, for the purpose of hindering, delaying or defrauding his creditors, cannot claim a resulting trust in a Court of Equity, which will not interfere between wrong-doers; yet, where, subsequent to the transaction, the beneficial owner, under a mistaken idea that he was insolvent, instructed the nominal purchaser of the property to postpone the execution of a deed, which the latter was about to make, reconveying the land, such fact cannot have the effect of depriving the beneficial owner of his right to recover the property, his intention to defraud his supposed creditors not being accompanied by any act which changed his relation to the property.

5. Where land has been substituted for a part of that affected by a resulting trust, the owner may follow it and have it declared subject to the trust.

This was a CIVIL ACTION, brought by the plaintiff to have the defendants declared trustees, for the benefit of plaintiff,

of a tract of land in McDowell County, N. C., known as the Duncan lands, brought to the Superior Court of McDowell County and removed for trial to Rutherford County, and tried at Spring Term, 1893, of RUTHERFORD Superior Court, before *Armfield, J.,* and a jury.

The plaintiff alleges that the lands in controversy were sold by a special proceeding on the part of the heirs of J. H. Duncan, deceased, and were purchased at a sale under judgment rendered in said proceeding, through George J. Moore, defendants' ancestor, and nephew of the plaintiff, with moneys furnished by the plaintiff; and that the deed to said land was made by the Commissioner at said sale to said George J. Moore on the 20th day of May, 1885, and that subsequent to said date, to-wit, April 6, 1886, the said George J. Moore purchased the dower interest of the widow of the late James H. Duncan in the aforesaid tract of land with moneys furnished by the plaintiff W. D. Summers, and as his agent, and took title to the same in his own name.

The defendants, in their answer, denied that George J. Moore, their ancestor, bought said land as trustee for plaintiff and with plaintiff's money, and allege that if plaintiff paid for said land, he procured the deeds to be made to said George J. Moore to cheat and defraud his (Summers') creditors.

On the trial plaintiff introduced J. B. Burgin, who testified that he surveyed the Duncan land for G. J. Moore, who requested him to make a survey of the outside boundaries, as he (Moore) might make a deed to plaintiff Summers, to whom the land belonged and who had furnished the money to pay for it. There being some difficulty in locating a part of the land, the survey was postponed until Summers, the plaintiff, could be present, and as the land belonged to Summers, Moore said he wanted him to see it surveyed. Witness said the purpose of the survey was to enable Moore to make a deed to Summers, who, as Moore declared, had furnished the money to purchase all the lands.

The plaintiff next introduced the depo-ition of A. W. Jameson, who testified as follows: " At the request of plaintiff, witness prepared a deed from George J. Moore and wife to the plaintiff W. D. Summers for the lands in controversy; don't remember the consideration mentioned in the deed, nor the date, though it was five or six years ago. The same conveyed an estate in fee simple. Moore and wife were not present. The deed was given by witness to Summers; witness does not know what became of deed. Mr. Summers was solvent at the time said deed was written by me, and he had the reputation of being a man of means."

Austin Conley testified: " Moore bid off the Duncan land and asked me to go his security for $350; I objected, and he said that I need not be afraid, as he was just acting as agent for Summers in this matter, and that the money would be forthcoming. I signed the note, and when it was due Summers sent him the money and he paid the note off. After this, and before he (Moore) moved to the Duncan place, I went to see Moore to get a place for a church on the Duncan land. Moore said he could not deed the land; that the right was in Summers. We asked him to write to Summers; he wrote, and in a few days we got an answer to make us a deed for a church site, and he made us the deed, but it was not probated till after Moore's death; it was found in his possession."

George Barnes testified for defendants: " I had a talk with Summers on the river opposite the Duncan property; and as we walked along, Summers said if he was George Moore he would fix some way to cross the river for the convenience of foot persons going to mill. Moore died in May, 1888. I saw Moore and the plaintiff together between the 1st of February and the last of April, and they were engaged in running over their books in a little store they had together and which was run in the name of Moore & Summers till Summers went home, and after that it was in the name of George J. Moore.

Moore told me after Summers left there that he was holding the Duncan place under a title in his own name. I think I know Summers' handwriting; the letters shown me are in Summers' handwriting."

The defendants introduced W. D. Summers, the plaintiff, as a witness, who testified that the letters shown him were in his handwriting.

George Barnes recalled : " Moore told me that the plaintiff furnished the first stock of goods. Moore owned no land before he got the Burgin land; he had some personal property; he said the plaintiff was a good friend and had helped him. My mother is a creditor of Moore. I run a grog-shop and have been indicted."

The defendants next introduced a letter from the plaintiff to George J. Moore, as follows:

"Statesville, N. C., January 28, 1886.

George: Yours to hand. I want you to have the deed that I made to you for the Burgin land registered, for I am going to see trouble by being security for C. L. Summers. I am afraid that it will take everything I have in this county to pay my own debts and the three thousand ($3,000) dollars of security money. The mill tract or Duncan tract I want you to keep the deed in your own name so that it can't be reached for any of my debts or security debts. The blank which I gave you to sign, don't sign it, but let the deed stay in your own name. I am seeing a heap of trouble. I will have to raise 300 dollars this week some way or other, but I don't know how. Write soon.

                    Your Uncle,                    W. D. S.

"P. S.: I wish you would take my name off the flour sacks and brand everything in your own name. Also let everything go in your own name in the store.

                    Your Uncle,                    B."

The defendants introduced in evidence a deed from Austin Conley to George J. Moore and wife Eliza Moore, dated the 3d day of March, 1888, which was admitted to cover a part of the lands sought to be uncovered in this action and embraced in the judgment. Also a deed to Moore from Duncan for the dower, dated April 6, 1886. Also a deed from Greenlee, Commissioner for the Duncan land, to Moore, dated 20th May, 1885. Eliza Moore, wife of said George J. Moore, died after her said husband.

Plaintiff in reply introduced W. A. Culbertson, who testified: "I live in McDowell County; I worked for Moore at the mill on the Duncan place; he was then living on the Burgin place; I repaired the mill, and he paid me and asked me for a receipt, and I gave it to him; he said he wanted this receipt for Uncle Billy (the plaintiff) to show what he (Moore) did with the money; he said the property belonged to Uncle Billy and he (plaintiff) does the paying, ' and when you work for me you must let me know eight or ten days before you want your money, for I have to send to Uncle Billy for the money'; he said that Uncle Billy had furnished the money to buy the property; I worked for him on the Burgin place on the pump line; I did some repairs on the saw-mill; Moore said he was going to move across to the Duncan place; I asked him why; he said, ' The property is Uncle Billy's, and what he says I will do; he wants me to move over and take care of the property.' I heard Moore say about the church lot, that he could not make a deed till he sent to Uncle Billy, for the property was his; Mr. Little asked him to write to Summers about it."

*Cross-examined:* "I worked on the mill in the spring and fall of 1886, and on the Moore (deed); I saw that Summers' name was off the flour sacks at Moore's death; think Moore moved to the Duncan place in August, 1886 or 1887; Moore went into business with Dysart not long before he died."

Mr. Murphy testified: "Moore told me that Uncle Billy wanted to get me to build a house on the Burgin place, and asked me to go home with him and see Summers; I went, and made a bargain with Summers, and built a house on the Burgin land; Summers paid for it; Moore told me that Summers paid for the land; after this, in April, 1887, Moore told me Uncle Billy wanted me to do some more work for him; I sent the price of it by Moore, and in a few days Summers said go on and do the work; I did it on the Duncan property, and Summers paid for it through Moore; Moore's wife wanted a nursery and a stairway in the Duncan house, and Moore said he would not have it done until Uncle Billy came, for the property belonged to Uncle Billy, and he had no right to make a bargain about it; when Summers came he agreed to the work and paid me for it; Summers said to Moore, if I needed anything out of the store to let me have it; Moore said the goods were his and Uncle Billy's."

W. D. Summers testified in his own behalf: "I wrote the letter of January 28, 1888, just after I had learned of an appeal bond in the case of C. L. Summers *v.* Watts and others; that plaintiff was under the impression that he had signed a supersedeas bond on a $6,000 judgment, which turned out afterwards he had never signed, and that he was only liable for a $25 appeal bond, instead of the supersedeas bond, as he had supposed, and that he deemed himself insolvent by reason of the supposed liability, and that plaintiff wrote the letter introduced in evidence while under such mistaken impression. When the land deed was made to Moore I had money on hand and was in debt but little and had property to pay all my debts; the money was paid for the Duncan lands about the middle of April, 1885; the judgment of Reynolds was my own debt; I have secured the Reynolds judgment by a mortgage on the Duncan property; I have paid and secured all of my individual debts, except

some security debts; I could pay all my debts to day, outside of the Duncan property, with property I own in Morganton, security debts and all; all the debts where I was security for C. L. Summers are paid; I thought I was insolvent in 1888, when I wrote the letter; I was not insolvent in 1886."

His Honor submitted to the jury two issues, as follows:

"1. Did George J. Moore, deceased, as agent of the plaintiff, and with the plaintiff's money or means, purchase the lands described in the complaint as the Duncan place?"

The jury answered "Yes."

"2. Did the plaintiff, at the time the deed for the lands was made to Moore, or at the time he assented thereto, give said assent for the purpose of hindering, delaying or defrauding his creditors?"

Jury answered "No."

The defendants tendered and asked to have submitted to the jury the following issue:

"3. Did the plaintiff procure the said George J. Moore to destroy the deed which said Moore had signed, or procure the said Moore not to execute a deed conveying the lands to plaintiff to hinder, delay or defraud the creditors of plaintiff?"

His Honor refused to submit this issue to the jury, and the defendants excepted.

The defendants' counsel asked his Honor to charge the jury—

"1. If George J. Moore caused to be prepared a deed to the plaintiff for the land in controversy, and that deed was destroyed by directions of the plaintiff, for the purpose of defrauding the creditors of plaintiff, the plaintiff cannot recover, for he who asks equitable relief must come into Court with clean hands."

His Honor declined the instructions as asked, and defendants excepted.

The defendants asked the Court to charge the jury if the title to the lands in controversy was made to George J. Moore with the knowledge, consent or approval of plaintiff, he would not be trustee for plaintiff, even though plaintiff paid for the land, for in that case it would be a gift, unless it was agreed at that time that George J. Moore should be trustee, and there was no fraud.

This instruction was declined as asked for, and defendants excepted.

His Honor then charged the jury as follows upon the points excepted to:

"That if the plaintiff, at the time the deed was made to George J. Moore for the land, or at the time the plaintiff assented thereto, gave such assent, or procured the deed to be so made, for the purpose of hindering, delaying or defrauding his (plaintiff's) creditors, or any of them, plaintiff could not recover in this action; but if, after the making of said deed to Moore, plaintiff conceived the idea of allowing the deed to remain in Moore's name, for the purpose of hindering, delaying or defrauding his (plaintiff's) creditors, this fact would only be evidence tending to throw light on what the plaintiff's motives were at the time the deed was originally made to Moore, or the time the plaintiff assented to it."

To this part of the charge the defendants excepted.

Defendants' counsel orally asked his Honor to charge the jury that to entitle the plaintiff to recover the evidence must have more than a mere preponderance; that it must be strong, clear and convincing, and that it must consist of facts and circumstances *dehors* the deed, and inconsistent with George J. Moore's ownership of the land.

His Honor gave these instructions as asked for, and told the jury that the law gave a peculiar force and solemnity to deeds and would not allow them to be overthrown by mere words, but only by facts, and that these facts must be strong, convincing and unequivocal; he told the jury that

26

plaintiff contended he had shown that Moore obtained the money to pay for the land from plaintiff; that Moore had the land surveyed for the purpose of making a deed for Summers; that he had the house repaired by plaintiff's direction; that he moved on the land, saying that he was going to occupy it for plaintiff, etc. That if the jury found that the plaintiff had established these things by the evidence, they were facts and circumstances *dehors* the deed tending to show that Moore was not the owner of the land; and they were of a character to comply with the first part of the rule of law, and also with the second part; that is, that the evidence must be strong, clear and convincing; but he told the jury that they were the sole judges of what the witnesses had said, and of how much it weighed, and that the burden of proof was on the plaintiff. Defendants excepted.

His Honor read the whole of the testimony to the jury, and commented upon it.

There was a verdict and judgment for plaintiff, and defendants appealed.

Defendants excepted to including the Austin Conley land in the judgment.

*Messrs. P. J. Sinclair, Armfield & Turner,* for plaintiff.
*Messrs. Justice & Justice,* for defendants (appellants).

SHEPHERD, C. J.: It is a well established principle that where, upon a purchase of property, the conveyance of the legal title is taken in the name of one person while the consideration is given or paid by another, at the same time or previously, and as part of the same transaction, the parties being strangers to each other, a resulting trust immediately arises from the transaction, and the person named in the conveyance will be a trustee for the party from whom the consideration proceeds.

"The rule has its foundation in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the purchase-money intends the purchase for his own benefit, and not for another, and that the conveyance in the name of another is a matter of convenience and arrangement between the parties for collateral purposes." 1 Perry Trusts; 2 Story Eq. Jur., 1201; Bisham Eq. Juris., § 79; Lewin on Trusts, 143. The above quotation from Mr. Perry, which is fully sustained by the authorities we have cited, is sufficient to meet the proposition of the defendant, that if the plaintiff consented that the title should be taken in the name of George J. Moore, the transaction amounted to a gift, and there could be no resulting trust. An examination of the authorities will disclose that in many of the cases the title was intentionally taken in the name of the third person as a matter of "convenience and arrangement" of the parties, and it is manifest that the exception of the defendant in this respect cannot be sustained.

Undoubtedly, parol evidence may be received to rebut a resulting trust, but the burden of proof is upon the nominal purchaser, and he must establish by sufficient testimony that it was intended that he should take a beneficial interest. 1 Perry Trust, 140; 2 Sugden Vendor & P., 139. There is no evidence in this case of any such purpose, nor, indeed, is there any evidence from which we can clearly infer that the plaintiff knew or assented to the title being taken in the name of the said Moore. Neither is there any force in the exception addressed to the charge as to the intensity of proof. His Honor charged "that the burden of proof was on the plaintiff," and that "the law gave a peculiar force and solemnity to deeds, and would not allow them to be overthrown by mere words, but only by facts, and that these facts must be strong, convincing and unequivocal." This, we think, was a substantial compliance with the rule laid down in *Harding* v. *Long*, 103 N. C., 1, and the cases there cited.

We are also of the opinion that the facts relied upon, *dehors* the deed, were sufficient to authorize the finding in favor of the resulting trust.

The issue as to whether the title was taken in the name of Moore for the purpose of hindering, delaying or defrauding the creditors of the plaintiff, was answered in the negative. Had it been answered in the affirmative, it is clear that the plaintiff would have no standing in a Court of Equity. *Turner* v. *Elford*, 5 Jones' Eq., 106. But it is insisted that this result must follow from the conduct of the plaintiff some two or three years after the creation of the trust. It seems that a deed from Moore to the plaintiff had been prepared, but not executed, and that the plaintiff, under the mistaken idea that he was liable as surety upon a *supersedeas* bond for $6,000, instead of an appeal bond for $25, wrote to the said Moore, for the purpose of avoiding the payment of the supposed liability, not to execute the said deed but to let the legal title continue in his name. His Honor held that this, in connection with other circumstances, might be considered by the jury in determining the issue above mentioned as to the intent with which the deed was originally made to Moore, but that, in the absence of any fraudulent intent existing at that time, this subsequent conduct of the plaintiff could not defeat his equitable rights in the said land. The principle invoked by the defendant is that, as between wrongdoers, the Courts will not interfere, but will leave each in the position which his own acts have placed him. There must, of course, be some act by which his relation to his property is changed; otherwise there is nothing upon which the principle can operate. In the present case the plaintiff did nothing which in the least altered his relation to the land. The legal title had not been made to him, and by postponing the execution of the conveyance he parted with nothing. The mere intention to defraud, unaccompanied by some change or disposition of property, cannot have the effect of depriving the owner of his interest therein.

SUMMERS *v.* MOORE.

We have examined the authorities cited by defendants' counsel, but they do not establish his contention. Very clearly the case of *Warlick* v. *White*, 86 N. C., 139, is not in point. In that case a deed had been made by the husband directly to the wife and, being lost, the Court held that it would not be upheld in equity as against the heirs of the husband. There was no valuable consideration, and the Court refused her relief, because, while her husband was in the army, she had adulterous intercourse with a negro, the fruit of which was a mulatto child, born soon after the death of her husband. In our case the entire consideration proceeded from the plaintiff, and, whatever his intentions may have been, in view of his supposed insolvency, he has done nothing, as we have said, by which his equitable rights in the property were changed.

As to the property substituted for a part of that affected with the trust, it is settled that the plaintiff may follow it, as he has done in this case. See authorities cited in *Edwards* v. *Culberson*, 111 N. C., 342.

We have carefully examined the whole record, and are unable to discover any ground which entitles the defendants to a new trial. It may not be improper to observe that the conclusion reached is in furtherance of justice, as the plaintiff, it seems, has actually charged this property with a mortgage to secure some of his creditors, while the defendants are relying upon a mere technicality to defeat the rights of those creditors, as well as the plaintiff's, and get the property without having paid for it.

Affirmed.